43 353
34a 534
43 353
47a 130
43 353
116 255
43 353
55a 122
56a 20
43 353
123 558
43 353
64a 367
64a 434
43 353
70a 546
43 353
142 231
144 586
74a 369
43 353
147 303
43 353
160 152
43 353
f152 594
43 353
95a 2 36
95a 2158

MOSES H. RUGGLES and JACOB M. BIXLER, Plaintiffs in Error, v. SARAH A. COLLIER et al., Defendants in Error.

1. *Corporations — Ordinances, validity of, how tested.*— The real test of all ordinances passed by an incorporated body is the intention of the Legislature in granting the charter. Corporations cannot make ordinances contrary to their constitution.

2. *Corporations — Legislative and ministerial powers, delegation of.*— There is a clear distinction between legislative and ministerial powers. The latter may be delegated; the former cannot. Legislative power implies judgment and discretion on the part of those who exercise it, and a special confidence and trust on the part of those who confer it.

3. *City of St. Louis — Charter — Repaving of Streets, by whom ordered.*— The nineteenth section of ordinance No. 5399 of the ordinances of the city of St. Louis, entitled "An ordinance establishing and regulating the engineer department" (Rev. Ord. 1866, p. 328), which provides that, within certain limits therein designated, the mayor is "authorized to cause the carriage-ways of the streets thereof to be repaved with wooden pavements, wherever and whenever he shall deem it necessary," is contrary to the provisions of section 3 of an act of the General Assembly of the State of Missouri, entitled "An act supplementary to the several acts to incorporate the city of St. Louis," approved March 5, 1855 (Rev. Ord. 1866, p. 108), which provides that, "in all cases where the city council shall deem it necessary, and also in all cases where the owners of the major part of the lots or land fronting on any paved street, or portion of a paved street, may petition for repaving the same,

Ruggles et al. v. Collicr et al.

the city council shall cause such repaving to be done in manner prescribed by ordinance." Said section 19 of said ordinance is therefore void. It was the intention of the Legislature, in conferring this power to repave streets, that the council should act, in determining this subject, in its legislative capacity; and power to act in that capacity cannot be delegated.

4. *City of St. Louis — Charter — Repaving Streets — By whose direction to be done — Design of Legislature.* — The Legislature clearly intended to place the responsibility of determining the matter of repaving the streets upon the city council, acting officially, when the initiatory steps were not taken by the property-owners themselves. The trust is, in effect, the power of taxation, which is the exercise of sovereign authority; and nothing but the most plain and explicit language can justify a court in holding that the Legislature intended to confer such exorbitant power on the mere discretion of a single city officer. .

5. *City of St. Louis — Charter — City Council — Repaving Streets — Policy of Legislature concerning.* — Said nineteenth section is not only violative of the express and positive language of the statute, but it defeats the whole policy which was a primary consideration in its passage. That exercise of judgment, discretion, and care which the persons most deeply interested had a right to expect on the part of those to whom they committed this important trust, perhaps on account of their peculiar fitness, is, by the operation of section 19, absolved and shifted, and placed in the mere discretion of a city officer.

6. *City of St. Louis — Amended Charter — Repairing and repaving streets.* — The act "supplementary," etc., above cited (Rev. Ord. 1866, p. 107), most clearly distinguishes between repairing the streets and repaving them, and makes separate provision for the two cases. No special ordinance is required in the case of repairs, but repaving is not placed in the same situation.

7. *Invalid Ordinance — Subsequent approval of contract made under, effect of.* — The subsequent approval of a contract, made under the provisions of section 19 of the ordinance above cited, is not sufficient to impart life or vitality to the contract made by the mayor, which was wholly void at its inception. The provision of the charter that every contract, although made in pursuance of a valid ordinance, is to be submitted to and approved by the council before it is final and complete, is designed to hold a check and control over the officer making the contract, and to see that it is made conformably to law; but it does not relate back to or cure defects in the ordinance itself.

### On Re-hearing.

8. *Legislature — Powers, delegation of — City Council — Improvement of Streets.* — The Legislature, in the delegation of power in the city charter, had the undoubted right to impose such restrictions as it saw proper; and if it deemed it proper and wise to require an act of legislation on the part of the city council in the matter of the repavement of the streets, or that they should act in a certain way or on certain conditions, the requirements must be complied with, else the proceedings will be void. A municipal corporation must conform strictly to the statute giving it power, or its acts will have no vitality.

Ruggles et al. v. Collier et al.

9. *City of St. Louis — Streets, repaving of — Power of, to be exercised by ordinance.*— The power of ordering the streets to be repaved could be exercised only by passing an ordinance, when the city council deemed it necessary, or when a petition was presented by the owners, or a major part of those owning lands or lots in any paved street, requesting it to be done. There is no other mode pointed out by the charter, and the mode here expresses the measure of power.

10. *Congress, right to delegate powers, compared with that of a city council.*— Cases where Congress has delegated its powers to the President bear no analogy to those where a city council delegates powers to a mayor. In the one case, by every rule of construction, the corporation is confined within the limits of its chartered powers. In the other case, the government is invested with the attributes of sovereignty, and always has resorted, and must resort, to many things lying within the vast domain of implied power.

### *Error to St. Louis Circuit Court.*

The facts of the case, as agreed upon by the parties, appear in the opinion of the court.

*R. M. Field,* and *A. N. Sterling,* for plaintiffs in error.

The question arising in the present case is whether the nineteenth section of the city ordinance establishing and regulating the engineer department is comfortable to the city charter.

The specific objection made and sustained in the court below was that the section in question amounted to a delegation to the mayor of the legislative power of the council, and the same was for that reason invalid. Consequently, all the work of the contractor was done under the authority of the mayor alone, and not under the authority of the council.

It will be proper, in the first place, to refer to such clauses of the charter as have an immediate bearing on the subject to be considered.

The ordinance in question was passed on the 5th day of August, 1864, and the general charter then in force was that of 1851. By the terms of this charter the council was empowered "to open, alter, abolish, widen, extend, establish, grade, pave, or otherwise improve, clean, and keep in repair, streets, avenues, and alleys." The same charter authorized the levying a special tax on the adjoining property-owners for grading and paving sidewalks.

The second section of the amendatory act of 1855 extends the provision as to a special tax on adjoining property-owners to all cases where streets are repaved. The third section of the same act is in these words: "Sec. 3. In all cases where the city council shall deem it necessary, and also in all cases where the owners of the major part of the lots or lands fronting on any paved street, or portion of the same, may petition for repaving the same, the city council shall cause such repaving to be done in the manner prescribed by ordinance."

The charter of 1851 provides that all work shall be let out by the city engineer to contractors, but that all contracts must be submitted to and approved by the council, or they will be invalid. This provision has been retained to the present time.

The foregoing statement of the provisions of the charter is believed to embrace all that is material to the present inquiry.

It is manifest that there is no plausible ground for contending that the work which is the subject of the present litigation was not done under the authority of the council. The contracts under which the plaintiffs acted were formally approved by the council; and they were entered into in pursuance of an ordinance passed by the council and approved by the mayor.

The objections taken to the ordinance will now be considered.

I. It is objected that the ordinance does not prescribe the manner of the work as the act of 1855 requires. The answer is:

1. The ordinance requires that the pavement shall be made of wood, and this is enough. It must be borne in mind that the streets to be repaved had all been long established in their directions, grade, and dimensions. In respect to such streets, it is conceived that the manner of the repavements could refer to nothing else than the material to be used.

2. The act of 1855 ought not to be construed as a limitation on the power of the council, but rather as a reservation of power to the council, to be exercised or not, at its pleasure.

The case of Noyes v. Ward, 19 Conn. 250, will illustrate and confirm this position. The council of the city of Norwich passed an ordinance authorizing the street surveyor "to make, maintain, and keep in repair all the streets and highways in the

city, under such regulations and directions as the common council may from time to time prescribe." No regulations were prescribed by the council, and the courts held that he was justified in acting by the ordinance.

The same point was decided by this court in St. Louis v. Oeters, 36 Mo. 463. The amendatory act of 1859 provides that " the common council may cause sewers to be constructed in each district, and sewers shall be made of such dimensions as may be prescribed by ordinance." It happened that the council did not prescribe the dimensions of the sewer in question; and counsel, of course, objected that the ordinance was void and the work illegally done. This court dispatched the objection in the following terms: " It is objected that the ordinance did not prescribe the dimensions of the sewer. The act gives the council power to prescribe the dimensions; and the ordinance authorizing the city engineer to construct the sewer gave him power to determine the dimensions of this particular sewer. It is not made a condition precedent, either of the power of the council or of the authority of the engineer. We do not see that this objection can be of any avail to the defendant."

3. The ordinance requiring a street to be paved is, under the charter, merely initiatory of the contract under which the work is to be done. If the charter had expressly declared that the ordinance should specify the mode and manner in which the work was to be done, such a provision could not justly be construed as being more than directory, a non-compliance with which would not avoid the contract.

4. The section of the ordinance in question is sustained by the general power to repair the streets conferred upon the council by the charter of 1851. For, when subsequent improvements are made to subsisting streets, previously put in proper condition, such improvements fall under the denomination of repairs. (People v. Brooklyn, 21 Barb. 494.) There is, then, no need to refer to the amendatory act of 1855 to sustain the ordinance.

II. Another objection taken to the ordinance is that it delegates to the mayor the legislative power of the council, in this: that it leaves to the discretion of the mayor to determine what portions of a large number of streets shall be repaved.

The general rule is indisputable that legislative power, implying, as it always does, judgment and wise discretion in those who exercise it, and a special confidence on the part of those who confer it, cannot be delegated over.

It is otherwise in regard to executive or ministerial duties. These may always be delegated to others.

Now, the making or repairing of streets is, in its nature, a merely executive or ministerial act. (*In re* Morris Square, 2 Hill, 21; People v. New York, 5 Barb. 42; Camden v. Mulford, 2 Dutch. 49.)

Such powers must be delegated, or they cannot be exercised at all. And all the incidents must follow the nature of the principal power, including the time, order, mode, and manner in which the work is to be done. In truth, many of these incidents are of such a nature that they can never be withdrawn from executive discretion. Take, as an illustration, the power to make repairs of the streets. This power is vested by the charter in the council, and by a general ordinance is delegated to a subordinate officer. On the reasoning of the court below, this ordinance is void, as an illegal delegation of authority. It would follow that whenever a culvert gives way, or the pavement sinks by the collapse of a sewer, there must be a special ordinance for the particular case, before the officer can act. This would be very unreasonable.

It does not give a just idea of the ordinance to represent it as limiting the repavements of the streets to such as might be directed in the discretion of the mayor. The truth is, the ordinance confers the authority to repave all the streets within the assigned limits, and the discretion of the mayor is restricted to the time and order in which the work is to be done. These, as we have just seen, are proper subjects of executive discretion.

There is manifestly a particular reason in the present case for leaving this matter to the discretion of the mayor. All the streets to which the ordinance extends were already paved. The intent was to substitute the wooden pavement for the old pavement when the latter became worn out. As the necessity for a new pavement would arise at different times along the several lines of the streets, it was very properly referred to the mayor to order the

Ruggles et al. v. Collier et al.

repavement to be made, from time to time, as the necessity for it should exist. The case, then, stands upon the same reason that applies to repairs, which must be made occasionally, as the necessity for them may arise.

· Great stress was laid, in the court below, upon these words in the nineteenth section: " wherever and whenever the Mayor shall deem it necessary; " and it is supposed that the decision of the court turned upon these particular words, and that the result would have been different if they had been omitted from the section.

Now, it is manifest that these words do really express no more than what would have been implied if they had been omitted. To test this, suppose the words were stricken from the section. The mayor then would have been authorized, without qualification, to cause all the streets within the limits fixed by the section to be repaved. But several miles of pavement can not be laid down *uno ictu*. Time is essential to the performance of the work, and this must necessarily be fixed by the officer who controls the work. So that the mayor must have exercised the same discretion as at present if the words in question had not been inserted in the section at all.

Since the ordinance of 1864 was passed, a new charter has been given to the city, substantially the same as the old charter on all the points bearing upon the present questions. There is some change of phraseology, but it is believed that the principles on which this case is to be decided remain unaffected. Counsel, therefore, have not deemed it necessary to enter into a particular examination of the present charter.

*Hitchcock & Lubke*, and *Voorhies & Mason*, for defendants in error.

I. The contract sued on, if valid at all, can only be so by reason of the validity of section 19 of "An ordinance establishing and regulating the engineer department," which ordinance was adopted by the city council of St. Louis and approved August 5, 1864; for plaintiffs expressly set out that section in their petition as the authority under which said contract was made. Defendants

insist that said section 19 was not authorized by the city charter, but was *ultra vires* and void; and if so, no claims based upon said section 19 can prevail.

II. It is conceded that the question of the authority of the city council to pass the ordinance in question depends on the true construction of the act amending the city charter, approved March 5, 1855, and which is found on page 351 of Session Acts 1855, also on pages 107–8 of Revised City Ordinances of 1866. Section 3 of this act exclusively relates to the subject of repaving streets in the city of St. Louis. By that section such repaving is authorized to be done only in one of two cases, neither of which appears by the record to have existed here.

III. Section 19 of said ordinance was *ultra vires* and void, in this: that it was an attempt to delegate to the mayor of the city of St. Louis a legislative discretion which section 3 of the act of March 5, 1855, expressly committed to the city council as such. It is not pretended here that any of the property-owners petitioned or desired this repaving to be done. The only other condition under which this work could lawfully be ordered or contracted for was "where the city council shall deem it necessary." There is no expression whatever by the city council of any opinion or belief that either this particular work sued for, or any of the repaving embraced within the terms of section 19 in question, was in fact necessary. There was not, then, any authority under the charter to make this contract; and section 19 of the ordinance was, in effect, an attempt by the city council to amend the city charter itself by an ordinance striking out the words "city council" and substituting "mayor" instead.

IV. The maxim *delegatus non potest delegare* applies to every case where functions in their nature judicial are to be exercised by a person or persons charged with a duty or power; and one vital difference between legislative and ministerial powers is that the former cannot be delegated—the latter may. (Sto. on Ag. §§ 11–15; Broome's Leg. Max. 569; Lyon v. Jerome, 26 Wend. 485; 13 Cal. 540–545; Kavanagh v. Brooklyn, 38 Barb., N. Y., 232.)

V. Corporate powers, especially where they involve taxing,

will be strictly construed, and cannot be claimed or executed unless clearly within the limits and executed in the precise mode pointed out by the charter. (Beatty v. Knowles's Lessee, 4 Pet. 152; United States v. Robertson, 5 Pet. 641; Thacher v. Dartmouth Bridge, 18 Pick. 501; Sharp v. Speir, 4 Hill, N. Y., 76, 83; Sharp v. Johnson, *id.* 92, 99; Cowan v. West Troy, 43 Barb., N. Y., 48; Clark v. Davenport, 14 Iowa, 494; McSpedon v. New York, 7 Bosw., N. Y., 601; Zottman v. San Francisco, 20 Cal. 96; Pimental v. San Francisco, 21 Cal. 351; State v. Hudson, 5 Dutch., N. J., 104; Baltimore v. Porter, 18 Md. 284; McCracken v. San Francisco, 16 Cal. 591; Grogan v. San Francisco, 18 Cal. 590; Johnson v. Common Council, 16 Ind. 227; Thompson v. Schermerhorn, 6 N. Y. 96; Bloom v. Burdick, 1 Hill, N. Y., 141.)

VI. The power of deciding upon the necessity of repaving any given street or streets is given by the charter (§ 3, Act of March 5, 1865) exclusively to the "city council," unless in cases where the adjoining owners shall petition; and the city council alone can decide this question, and until they do actually decide it no power to contract for such work exists. The repairing of streets, etc., is a different thing, and is expressly provided for separately in section 2; and for this purpose general power is given by section 2 to the city engineer. But the work in this case is repaving, not repairing; and nowhere in the act is authority given to anybody to leave any such work to the future discretion of the mayor.

VII. The Legislature having designated "the city council" as the body to exercise the necessary discretion in this matter, it must be exercised by them in the regular course of their legislative functions. (*Ex parte* Winsor, 3 Sto. 411.)

VIII. Nothing in section 19 in question purports to be an exercise by the council of the legislative discretion thus intrusted to them. It is left absolutely to the mayor to cause such work to be done, at any point or points within a given district covering miles of streets, "whenever and wherever he shall deem it necessary;" and he is not required to act at all. It is conceded by counsel for plaintiffs that if the mayor had not for twenty years "deemed it necessary," he was under no obligation or duty what-

ever to contract for any such work. The word "authorize," in section 19 of the ordinance, is in no sense an expression of the opinion of the council that they deem it necessary to do the work; it is not even a command to the mayor to form a judgment of his own. It says, in effect, simply this: that if the mayor should form an opinion of his own, and if the mayor's own private opinion should be that the work was necessary at any particular place, and if he should, upon that opinion, choose to make contracts — why, then, he is "authorized" to do so. But it also contains the alternative that if the mayor do not choose to form an opinion, or if his opinion when formed is adverse — why, he need not do anything about it. But as for the city council, they decline to express any opinion on the subject.

IX. The power delegated to the mayor is one susceptible of great and dangerous abuse, and no court will presume, from anything short of express words, that the Legislature intended to confer or authorize it to be conferred on him. (Thompson v. Schermerhorn, 6 N. Y. 96; Clark v. Davenport, 14 Iowa, 494, 560.)

X. The passage of a resolution by the city council, approving the contract after it was made, could not give validity to that which was originally unlawful. It was not even in apparent pursuance of the charter, which (§ 3, Act of March 5, 1855) required the work to be done as prescribed by ordinance. (McCracken v. San Francisco, 15 Cal. 592, 622–3, affirmed in 18 Cal. 591; Zottman v. San Francisco, 20 Cal. 96, 102–3; Cowan v. West Troy, 43 Barb., N. Y., 53; Hodges v. Buffalo, 2 Denio, 113.)

XI. The plaintiffs, in entering into this supposed contract, took the risk of its validity, and were bound to know that the requirements of the city charter had been fully complied with. (Cowan v. West Troy, 43 Barb. 53; Brady v. New York, 16 How. 432; Johnson v. Common Council, 16 Ind. 227.)

XII. It is perfectly obvious that when, in 1855, the Legislature amended the city charter on this very subject, the intention of the amendment was not only to impose upon the property-owners the cost of grading, repairing, paving, and repaving, but

also expressly to separate the work of repairing from that of repaving, and to provide for and authorize the latter, under conditions and restrictions wholly different from the former.   Considering the nature and enormous cost of paving and repaving, as compared with repairing streets already made, the reason of the difference is obvious.   And, in fact, while section 2 left it to the city engineer to keep the streets in repair under the control of the council, section 3 expressly throws upon "the city council," as such, the duty and the responsibility of judicially determining the necessity of such work before it could be done, unless, of course, where the owners petitioned for it.   By this requirement the property-owners are protected, as far as may be, by the publicity which the charter provisions as to passing ordinances require; by the opportunity thus given to property-owners to know, inquire, and remonstrate; and by the personal and official responsibility of the members of the council to their constituents.   But by section 19 of this ordinance, every such guard is thrown down, and the disbursement of millions of dollars is left to the decision—it may be to the corrupt decision—of one man, whose purposes no one may know or dream of till too late, except those who are to profit by it.   Is this what the Legislature intended?   Such a construction of the charter is in the teeth of every principle which the courts have so zealously declared for the protection of the citizens.   (State v. City of Hudson, 5 Dutch., N. J., 106, 110; Bloom v. Burdick, 1 Hill, N. Y., 142; Baltimore v. Porter, 18 Md. 284, 298.)

WAGNER, Judge, delivered the opinion of the court.

This was an action brought in the St. Louis Circuit Court to enforce the payment of a special tax bill issued by the St. Louis city engineer under a street-paving contract.

The petition sets forth, in substance, that the defendants are the proprietors of a lot in block No. 11 in St. Louis, fronting on the south upon Olive street, and on the west upon Commercial street.   The petition also sets out *verbatim* the nineteenth section of an ordinance entitled "An ordinance establishing and regulating the engineer department," approved August 5, 1864.   The

section is in the following words: "Sec. 19. In that portion of the city bounded on the north by the north side of Carr street, on the west by the east side of Ninth street, on the south by the south side of Poplar street, and on the east by the Levee, the mayor is hereby authorized to cause the carriage-ways of the streets thereof to be repaved with wooden pavement wherever and whenever he shall deem it necessary; and he may instruct the city engineer to cause any street or portion of street within the above described limits to be so repaved under the contract, which shall be let out in the usual manner."

The petition then states that the city engineer, acting under the authority of said ordinance, entered into a contract with the plaintiffs to repave Olive street and Commercial street in front of the property of the defendants and others; that the contract was submitted to and approved by the city council on the 14th day of June, 1867; that the work under the contract was done by the plaintiffs, and a special tax bill delivered to the plaintiffs against the defendants by the city engineer, amounting to $613, and that the defendants have refused to pay the same. The petition asks judgment for the said amount, with fifteen per cent. interest, and a special execution against the property chargeable with the lien.

The defendants appeared in the Circuit Court and filed a demurrer to the petition, assigning the following grounds: 1st. That the nineteenth section of the city ordinance set out in the petition was not authorized by the city charter, and was illegal and void. 2d. That the work done by the plaintiffs was done without authority of law or of any valid city ordinance.

The Circuit Court in general term sustained the demurrer, and, the plaintiffs declining to take leave to amend, the court rendered a final judgment for the defendants. The case is now brought into court by writ of error.

The material question arising is whether the nineteenth section of the city ordinance establishing and regulating the engineer department is comformable to the city charter. The act supplementary to the several acts to incorporate the city of St. Louis, approved March 5, 1855, and which was in force when the above ordinance was passed, provides, in section 3, that "in those cases where the

city council shall deem it necessary, and also in all cases where the owners of the major part of the lots or lands fronting on any paved street or portion of a paved street, or any paved alley or portion of a paved alley, may petition for repaving the same, the city council shall cause such repaving to be done in the manner prescribed by ordinance."

The objection made by the demurrer and sustained in the court below was the invalidity of the ordinance under which the work was done; and the reasons given in support of that objection are that the nineteenth section amounted to a delegation to the mayor of the legislative power of the council, and that consequently all the work of the contractors was done under the authority of the mayor alone, and not under the authority of the council.

The real test of all ordinances passed by an incorporated body is the intention of the Legislature in granting the charter. Corporations cannot make ordinances contrary to their constitution. Mr. Justice Story says: "When the corporation itself is pointed out as the proper functionary to execute a discretionary power, the true conclusion is, in the absence of all other provisions, that it must be solely exercised by the corporation at its legal meeting held for that purpose." (*Ex parte* Winsor, 3 Story, 411.)

There is a clear distinction to be observed between legislative and ministerial powers. The former cannot be delegated; the latter may. Legislative power implies judgment and discretion upon the part of those who exercise it, and a special confidence and trust upon the part of those who confer it.

The charter designates and prescribes two conditions upon which streets may be repaved: First, where the city council shall deem it necessary; and secondly, where the owners or a major part of them owning lands or lots fronting on any paved street shall petition for the same. The natural and inevitable conclusion is, that it was the intention of the Legislature, in conferring the power, that the council should act, in determining this subject, in its legislative capacity. Indeed, the language will bear no other construction. I can perceive no authority whatever in the charter that would justify the council in referring to another

24—VOL. XLIII.

person or body the right to determine when the work of repaving should be done. The Legislature intended clearly to place the responsibility of determining the matter upon the city council, acting officially, when the initiatory steps were not taken by the property owners themselves. The trust is one of great and peculiar importance, as the expenses of the improvements are by the law to be paid by the owners of the property. It is, in effect, a power of taxation, which is the exercise of sovereign authority; and nothing but the most plain and explicit language can induce or justify a court in holding that the Legislature intended to confer such exorbitant power on the mere discretion of a single city officer. The charter not only contains no language from which the authority can be deduced, but to my mind it clearly expresses the intention of confining the exercise of the power to the city council, the members of which are elected by and responsible to those upon whose property they are thus allowed to impose a tax. It was no doubt with this view that the statute was passed, the Legislature deeming that the responsibility of each member to his constituents who were immediately interested in the work, and who had to bear the burdens, would be a check upon the improvident exercise of the power, and an inducement to the wise and discreet exercise of the legislative judgment of the council. But the nineteenth section of the ordinance is not only violative of the express and positive language of the statute, but it defeats the whole policy which was a primary consideration in its passage. That exercise of judgment, discretion, and care, which the persons most deeply interested had a right to expect on the part of those to whom they committed their important trust, perhaps on account of their peculiar fitness, is absolved and shifted, and placed in the mere discretion of a city officer.

There is nothing imperative on the mayor; he may act, or not, at his mere pleasure and caprice. It is easy to perceive that such a power might be susceptible of the greatest abuse, and the law has wisely withheld it.

There being no action taken by the council in which it was deemed necessary that the street in question should be repaved, nor any petition presented by the major part of the persons own-

ing property fronting thereon, the section in controversy must be held to be *ultra vires* and void.

It is contended by the counsel for plaintiffs in error that the ordinance may be sustained by virtue of the power given in the act authorizing and empowering the city engineer, under the control of the city council, to repair and keep in repair all streets and alleys in the city of St. Louis, and to this end cause all the necessary work to be done.

But this is evidently not the intention of the statute. The second section of the supplementary act authorizing the city engineer to cause repairing to be done specifies distinctly what work he shall be empowered to do, other than repairing in the first section. The third section, providing for repaving of streets, is a separate and independent section, and can only be made operative by the performance of one of the alternative precedent conditions contained therein. The act most clearly distinguishes between repairing the streets and repaving them; it uses the terms as distinct things, and makes separate provision for them. No special ordinance seems to be provided in case of ·repairs. The city engineer is empowered by the statute itself with the duty of seeing that repairs are made, subject to the control of the city council; but repaving is not placed in the same situation.

It is also suggested that because the contract in question was afterward approved by the council, it ought therefore to be held good as done under the authority of the council. But this position is, I think, not tenable. It is certainly not sufficient to impart life or vitality to the contract made by the direction of the mayor, and which was wholly void at its inception. By the charter it appears that every contract, although made in pursuance of a valid ordinance, is required to be submitted to and approved by the council before it is final and complete. This provision is obviously to hold a check and control over the officer making the contract, and to see that it is made conformably to law, but it cannot be made to avail the plaintiffs here.

With this view of the case, I think judgment should be affirmed. The other judges concur.

On motion of plaintiffs in error, the cause afterward came up for re-hearing.

*R. M. Field*, and *H. A. Clover*, for plaintiffs in error.

The general proposition is admitted that legislative power conferred on a select body cannot be delegated by such body to other persons. But to determine the just application of this rule, reference must be had to the nature of the power in question. It is not enough that the particular power is conferred upon the legislative department. That does not necessarily make it a legislative power. In every constitution or charter establishing a national, state, or municipal government, there will be found to be a large mass of powers conferred on the legislative department that may be properly denominated administrative powers. The execution of these powers is generally confided by the Legislature to the discretion of subordinate officers, under such regulations as the Legislature may see fit to prescribe.

The distinction just pointed out was recognized and acted upon by the Supreme Court of the United States in Wayman v. Southard, 10 Wheat. 1. In that case it was contended that the provisions of the judiciary act authorizing the Supreme Court to prescribe by rule the manner of serving final process were unconstitutional, as amounting to a delegation of legislative power. The point was overruled by the court. Chief Justice Marshall, in giving the opinion of the court, said: "It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative. But Congress may certainly delegate to others powers which the Legislature may rightfully exercise itself. Without going further for examples, we will take that, the legality of which the counsel for the defendants admit. The seventeenth section of the judiciary act, and the seventh section of the additional act, empower the courts respectively to regulate their practice. It certainly will not be contended that this might not be done by Congress. The courts, for example, may make rules directing the return of process, the filing of pleadings, and other things of the same description. It will not be contended that these things might not be

done by the Legislature without the intervention of the courts; yet it is not alleged that the power may not be conferred on the judicial department. The line has not been exactly drawn which separates those important subjects which must be entirely regulated by the Legislature itself, from those of less interest in which a general provision may be made and power given to those who are to act under such general provision to fill up the details. The difference between the departments undoubtedly is that the Legislature makes, the executive executes, and the judiciary construes, the law; but the makers of the law may commit something to the discretion of the other departments, and the precise boundary of this power is a subject of delicate and difficult inquiry, into which a court will not enter unnecessarily."

The actual legislation of Congress furnishes striking illustrations of the practical application of the principles settled in the foregoing decision. In most cases, where the administrative powers of the legislative department come to be exercised, it will be found that Congress contents itself with indicating the general end to be accomplished, and leaves to the executive department the selection of the appropriate scheme for the attainment of the proposed end. It may be proper to cite a few of the early acts of Congress to illustrate this position. The constitution confers on Congress the power "to raise armies." On the 29th of September, 1789, Congress passed the first act on this subject; and it was provided "that, for the purpose of protecting the inhabitants of the frontiers from the hostile invasions of the Indians, the President is authorized to call into service, from time to time, such part of the militia of the States as he may judge necessary for the purpose aforesaid." (1 Sto. Laws U. S. 69.) This provision was temporary, but was made perpetual at the next session. (*Id.* 90.) By the act of March 3, 1791, the President was authorized, in his discretion, to raise a body of cavalry, to serve for such time and on such terms as he should deem it expedient to prescribe. (*Id.* 205.) By the act of March 5, 1792, the President was "authorized from time to time to call into service, and for such periods as he may deem requisite, such number of cavalry as in his judgment may be necessary for the protection

of the frontiers." And also, "in case he shall deem the measure expedient, to employ such number of the Indians, and for such compensation, as he may think proper." (*Id.* 223.) By the act of February 28, 1795, the President was authorized, in certain exigencies, to call forth such number of the militia as he might deem necessary. (*Id.* 389.) The Supreme Court of the United States held this act to be constitutional, and that the President was the sole judge of the existence of the exigency. (Martin v. Mott, 12 Wheat. 19.)

Congress is empowered by the constitution "to provide a navy." By the act of June 5, 1794, the President was authorized, if it should appear to him to be necessary, to purchase or build ten vessels, and to equip the same as galleys or otherwise.

Congress is also vested with power "to regulate commerce with the Indian tribes." By the act of July 22, 1790, the President was authorized to appoint a superintendent, and to issue licenses to trade with the Indians; and the persons licensed were to be "governed, in all things touching said trade and intercourse, by such rules and regulations as the President shall prescribe."

The power to coin money and regulate the value thereof is vested in Congress. By the act of March 3, 1795, the President was authorized, whenever he should deem it for the benefit of the United States, to reduce the weight of the copper coin, and give notice thereof by proclamation. (1 Sto. Laws U. S. 407.)

Under the power to establish the permanent seat of government, Congress, by the act of July 16, 1790, authorized the President to appoint three commissioners, who, under his direction, were to mark out by metes and bounds a district of territory on the Potomac river, which district should become the seat of government. And the commissioners were further empowered to procure suitable grounds for public buildings, and, according to plans to be approved by the President, to erect suitable buildings for the use of the government. (*Id.* 101.)

The constitution confers on Congress the power to regulate commerce. This power has been held to embrace the laying of embargoes, the erection of light-houses, and the improvement of ports and harbors. In these particulars the power has been freely

Ruggles et al. v. Collier et al.

delegated by Congress to executive officers. By the act of June 4, 1794, the President, during the recess of Congress, was authorized, whenever in his opinion the public safety shall require, to lay an embargo on ships in port, and continue or revoke the same whenever he shall think proper. (*Id.* 342.) By the act of August 7, 1789, it was directed that a light-house should be erected near the mouth of Chesapeake Bay, at such place as the President should direct. (*Id.* 33.) So, by the act of March 3, 1797, the Secretary of the Treasury was authorized to cause buoys to be placed in and near the harbor of Boston, for the security of navigation. (*Id.* 465.)

Further references illustrating the point under consideration might be made; for the practice of delegating to the President and subordinate officers the administrative powers conferred on Congress has been continued to the present day. But it is believed that enough has been presented to show that the position of the defendants cannot be maintained. The practice of our own Legislature has always conformed to that of Congress in the delegation of its administrative powers. Among the early acts of the Territorial Legislature was the general road law of 1806, by which the power of laying out, constructing, and repairing public highways was delegated to the courts of quarter sessions for their respective districts. (1 Terr. Laws, 86.)

By the act of November 10, 1808, it was provided that the governor was to appoint commissioners to mark out a road from St. Louis to New Madrid, and the same, if approved by the governor, was declared to be a public road, to be constructed by the several districts, under the order of the courts of quarter sessions. (*Id.* 285.)

The making of roads, bridges, and other public improvements, was, by the constitution of 1820, enjoined upon the General Assembly as a duty. Practically, we know that this business has always been committed by the General Assembly to subordinate tribunals, municipalities, chartered companies, and individuals. The right of eminent domain is a high attribute of sovereignty, but it has rarely if ever been directly exercised by the State. From the earliest days of the government this right has been freely delegated by the Legislature.

The attention of the court has been directed to the circumstance that the powers to pave the streets and to repair the streets are conferred upon the council by the same clause of the charter. Now, it is obvious that these powers are of the same character. If the one is a power " strictly and exclusively legislative," so is the other likewise. The unreasonableness and inconvenience of such construction are manifest. The city would never have had power under its charter to adopt any general system of repairs, for such system would necessarily involve an illegal delegation of legislative authority.

In answer to this the other side is content to cite an amendatory act, passed in 1855, vesting authority in the city engineer to repair the streets. This amendment might relieve the council of St. Louis from some practical embarrassment, but it furnishes no answer to the argument as to the nature of the power. 'In fact, it seems to bear strongly against the doctrine of the other side; for, if the power to repair be taken as properly legislative, it is surprising that the General Assembly should confer it on an inferior ministerial officer. Besides, the inconveniences above alluded to would continue; for the engineer, clothed with legislative power, could not act by deputy, and the business of repairing all the streets and alleys of this great city, covering more than twenty square miles, would be devolved upon one man.

There are in this State more than thirty chartered cities in addition to St. Louis. In every one of the charters the powers to pave and repair streets are given to the council in one and the same clause of the charter. In none of them is any power to repair conferred upon any other officer. It is manifest, therefore, that any fanciful distinction established upon a particular amendment to the charter of St. Louis, if it could avail to relieve the defendants in the present case, would tend to cripple all the other cities in the exercise of their power.

The case of St. Louis v. Oeters is regarded by the plaintiffs' council as decisive of the present controversy. The charter authorizing the construction of sewers declares that " sewers shall be made of such dimensions as may be prescribed by ordinance." It was contended by counsel in that case that the language of the charter was imperative, and that the ordinance

delegating to the engineer the power to fix the dimensions of the sewer was void; consequently, the work was illegally done, and the tax-payer could not be compelled to pay for it. Judge Holmes, in giving the opinion of the court, adopts the views of the Supreme Court of the United States in Wayman v. Southard, and plainly declares that the power conferred on the council was one which it might exercise itself or might delegate to the engineer.

The other side lays great stress on the circumstance that the power of the council is limited to cases "where the city council shall deem it necessary." But evidently these words have no particular effect. A power given to do a thing is not at all affected by the addition of such words as "whenever deemed necessary," or "expedient," or "proper," for the person who is to do the thing is made the judge of the qualification. All power conferred on public officers is a trust, and it is always implied that the power is to be exercised with prudence and discretion. No change, therefore, in the nature of the power is effected by expressing qualifications that are always implied. So that we come back to the question with which we started, whether the particular power in controversy was "strictly and exclusively legislative" and could only be exercised by the hands to which the charter directly commits it.

*Hitchcock & Lubke*, and *Voorhies & Mason*, for defendants in error.

There is a vital, obvious, and broad distinction between the right of the National or State Legislature to confer discretionary power on agents or officers appointed to discharge public duties, on the one hand, and the right of a private or municipal corporation to hand over to a third person the exercise of a discretionary power, judicial in its nature, which by the terms of the charter is expressly committed to such corporation. In governmental affairs it is unavoidable that in some cases and to some extent a power committed to the Legislature shall be exercised by public officers having to a certain extent discretionary powers. In other cases the Legislature itself cannot delegate its own discre-

tion; and the Supreme Court of the United States, in Wayman v. Southard, 10 Wheat. 1, expressly recognizes the existence of such a distinction. To deny it would be to say that Congress or the State Legislature must provide in detail for everything which is or may be required to be done under authority of law. We contend for no such absurdity. But when one of these public officers, whether a sole agent or a municipal corporation, has been created, and certain duties and powers expressly intrusted to it, and a condition prefixed to the exercise of such powers or duties which requires the exercise by such officer or such corporation of its judicial discretion, then this trust—this discretion—cannot be delegated. And this is the case before the court. The ordinance of a city corporation directing the construction of the work within the general scope of its powers is a judicial act. (Kavanagh v. Brooklyn, 38 Barb. 237.) Here the trust reposed expressly in the "common council" was to determine—to judge—whether or not a given piece of repaving was necessary. Such a trust as this—such a judicial exercise of their official discretion—could not be delegated. If they could delegate it to the mayor (who is not mentioned in the charter in that connection), why not to the contractor as well? They passed an ordinance which does not pretend to contain or to imply the forming of any opinion whatever; on the contrary, it is left discretionary with the mayor whether even he will form an opinion, much less act on it. What has such a case as this to do with the right of Congress to empower the President to determine whether or how far he shall exercise, through the machinery provided by Congress, the executive power which the United States constitution commits to him as constituting one department of the government?

In truth, if the doctrine of the right "to delegate legislative power," so earnestly contended for by the plaintiffs, be applicable to this city charter, then what is to prevent the city council from "delegating" to the mayor, or to any one of their own number, by one sweeping ordinance, the discretionary power to do any other thing which the charter makes it their duty as a council to do? Why cannot the mayor, or the president of the council, if authorized so to do, "whenever and wherever he deems it neces-

sary," take charge of the whole city government, and "run it" to suit himself?

It is noticeable that, though the books are full of cases involving questions of corporate power like this, no case cited by the plaintiffs even intimates such a view as the one above referred to. All the citations are made by the defendants, and are on the other side.

.WAGNER, Judge, delivered the opinion of the court.

This case was decided at the October term of this court, and, at the urgent solicitation of the counsel for the plaintiffs in error, a re-hearing was granted. The case has now been re-argued with learning and distinguished ability by the eminent counsel, and I will proceed to state the reasons for the conclusions we have reached. It will be unnecessary to give any further statement than that contained in the previous opinion. The whole question is one of power, and resolves itself into the simple issue whether the common council, in delegating the authority to the mayor, acted within the prescribed sphere of their duties, as limited and defined by the city charter, or whether they transcended their legitimate scope and authority, so that their action was unwarranted and void.

Corporations differ from individuals. They have no powers except such as are expressly granted in the charters, and such as are auxiliary or necessary to the proper exercise of the powers conferred; and all statutes or charters creating corporations are to be strictly construed. (Blair v. Perpetual Ins. Co., 10 Mo. 559; Beatty v. Knowles, 4 Pet. 152; Penn. R.R. Co. v. Canal Com., 21 Penn. St. 9; The People v. Utica Ins. Co., 15 Johns. 357.) Their charter is the constitution which authorizes them to act; it is in the nature of a grant of powers, and they can exercise such powers and such only as are contained therein. If specific modes and forms are pointed out to govern in their proceedings, such modes and forms must be pursued. In the case of Head *et al.* v. The Providence Insurance Company, 2 Cranch, 169, Chief Justice Marshall, in speaking of corporate bodies which have only a legal existence, said: "The act of incorporation is to them an

enabling act; it gives them all the power they possess; it enables them to contract, and, when it prescribes to them the mode of contracting, they must observe the mode, or the instrument no more creates a contract than if the body had never been incorporated."

In The Farmers' Loan and Trust Company v. Carroll (5 Barb. 49), the Supreme Court of New York said: "When a corporation relies upon a grant of power from the Legislature to do an act, it is as much restricted to the mode prescribed by the statute for its exercise as the thing allowed to be done." Now, the Legislature, in the delegation of power in the city charter, had the undoubted right to impose such restrictions as it saw proper; and if it deemed it proper and wise to require an act of legislation on the part of the city council in the matter of the repavement of streets, or that they should act in a certain way or on certain conditions, the requirements must be complied with, else the proceedings will be· void. A municipal corporation must conform strictly to the statute giving it power, or its acts will have no vitality. In Thompson v. Schermerhorn (2 Seld. 92), the act of the Legislature "relative to the city of Schenectady" authorized that city to make "by-laws and ordinances ordering and directing any of the streets to be pitched, leveled, paved, flagged, etc., or for the altering or repairing the same, within such times and in such manner as they may prescribe, under the superintendent." The common council passed an ordinance by which they directed State street, between certain points, to be "pitched, leveled, and flagged, in such manner as the city superintendent, under the direction of the committee on roads of the common council, should direct and require." Here, it will be observed that, instead of the city council prescribing the time and manner, they authorized the work to be done by the city superintendent, under the direction and requirement of the committee on roads of the common council, just as in this case it was ordered to be done by direction of the mayor. Yet the Court of Appeals held that the ordinance was void, because it did not prescribe the manner in which the street and sidewalks were to be pitched, leveled, paved, and flagged; that the common council were required by the statute to

determine, themselves, the manner in which the improvement should be made, and could not delegate that power to any officer or committee of the corporation. The books are full of cases supporting this view, but it is unnecessary to cumber this opinion with numerous citations of authorities.

The power of ordering the streets to be repaved could be exercised only by passing an ordinance when the city council deemed it necessary, or when a petition was presented by the owners, or a major part of those owning lands or lots in any paved street, requesting it to be done. There is no other mode pointed out by the charter, and the mode here expresses the measure of power. The learned counsel for the plaintiffs in error have attempted to obtain aid in support of the doctrine they contend for by referring to the action of the general government in investing the President with certain powers. But I am unable to perceive any analogy between the cases. In the one case, by every rule of construction, the corporation is confined within the exact limit of its chartered powers ; in the other case the government is invested with the attributes of sovereignty, and always has resorted, and necessarily must resort, to many things lying within the vast domain of implied power.

We adhere to the former opinion given in this case, and order the judgment to be affirmed. The other judges concur.